RENDERED: JULY 29, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1066-MR

THOMAS BIEDERMAN                                                    APPELLANT

APPEAL FROM BOYD CIRCUIT COURT
v.       HONORABLE GEORGE W. DAVIS, III, JUDGE
ACTION NO. 12-CR-00028

COMMONWEALTH OF KENTUCKY                                   APPELLEE

AND

NO. 2021-CA-0825-MR

THOMAS BIEDERMAN                                                    APPELLANT

APPEAL FROM BOYD CIRCUIT COURT
v.       HONORABLE GEORGE W. DAVIS, III, JUDGE
ACTION NO. 12-CR-00028

COMMONWEALTH OF KENTUCKY                                   APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, CETRULO, AND L. THOMPSON, JUDGES.

CETRULO, JUDGE:  Appellant Thomas Biederman ("Biederman"), *pro se*, appeals the Boyd Circuit Court's denial of his RCr[1] 11.42 motion to vacate, set aside, or correct his sentence and his CR[2] 60.02 motion to vacate his sentence.[3] Upon review, finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In late July 2011, Biederman's former wife sustained significant injuries – including second- and third-degree burns[4] and later development of post-traumatic stress disorder – when pipe bombs exploded under the driver's seat of her car.  Biederman was indicted on one count of second-degree use of a weapon of mass destruction and one count of criminal attempt to commit murder.  Despite multiple discussions regarding potential plea deals, Biederman maintained his innocence and went to trial.  At trial, the Commonwealth presented a case that relied, in pertinent part, on bomb-making recipes found on Biederman's family computer; bomb-making materials found at the Biederman home; and the victim's

---

[1] Kentucky Rule of Criminal Procedure.

[2] Kentucky Rule of Civil Procedure.

[3] This Court granted the Commonwealth's motion to consolidate the RCr 11.42 appeal and CR 60.02 appeal.

[4] Although there were questions as to whether the victim actually sustained third-degree burns, both Biederman and the Commonwealth list this injury in their statement of the facts.

injuries. In support of its case, the Commonwealth called numerous witnesses – some of which were law enforcement experts in forensics, computers, and explosives – and called the victim to testify to her injuries.

Biederman's trial counsel, Michael Curtis ("TC Curtis"), cross-examined the Commonwealth's witnesses and brought forth evidence to show that the entire family had access to the Biederman family computer; that the bomb-making materials found at the Biederman home did not match those found in the bomb at the crime scene; and that, although the victim did sustain injuries, she was able to walk into court with no limp and did not maintain the continuous injuries as alleged. He also called Biederman's daughter to testify to his general disposition, and she expressed love for her father and her doubt that he could have committed the offenses.

Before deliberation, the parties agreed that they did not want the jurors to take their notes into deliberation and the trial judge did not allow their use. After a two-hour deliberation, the jury found Biederman guilty on both charges and sentenced him to 40 years in prison. On direct appeal,[5] our Kentucky Supreme Court affirmed the convictions and found the evidence supported Biederman's classification as a violent offender; that the trial court's refusal to

---

[5] Biederman appealed the conviction as a matter of right directly to the Kentucky Supreme Court because his sentence was greater than 20 years, pursuant to Kentucky Constitution § 110(2)(b).

allow jurors to use their notes in deliberation was not structural error; and that evidence was sufficient to support the convictions. *Biederman v. Commonwealth*, 434 S.W.3d 40 (Ky. 2014).

In March 2015, Biederman filed an RCr 11.42 motion to vacate, set aside, or correct his sentence, *pro se*. Subsequently, the trial court appointed the Department of Public Advocacy ("DPA") to represent Biederman in the proceedings and the DPA supplemented his motion in October 2016. The supplemented motion claimed:[6] (1) trial counsel was ineffective for agreeing to prohibit jurors from taking their notes into the jury room during deliberations; and (2) trial counsel was ineffective for failing to adequately investigate and therefore did not present an effective defense at trial.

The trial court held a series of evidentiary hearings on those claims, in which all parties were present, and TC Curtis testified as to his trial strategy. Specifically, TC Curtis explained that he agreed with the Commonwealth to prohibit jurors from taking their notes to deliberation because he noticed the jurors were "furiously writing" while watching a video of Biederman's interviews with Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents.[7] He

---

[6] There were five claims total, but the trial court previously addressed the remaining claims or noted that the claims were not properly before the court, *e.g.*, the trial court stated it did not have authority to address the claims against appellate counsel and that Biederman should have raised them in the appellate court in which the case was practiced.

[7] During those interviews, Biederman made incriminating statements.

further testified that he wanted the jurors to have to recall the specifics of those interviews from memory because the contents did not show Biederman in the best light. TC Curtis emphasized that to this day, he still prefers that jurors leave their notes outside the deliberation room.[8]

Additionally, TC Curtis testified as to his general trial strategy and preparation. He stated that he would have interviewed every witness Biederman provided, if he was able to get ahold of them. Of those he was able to contact, he recalled that many mentioned that Biederman periodically set bombs off in his backyard. After speaking with those witnesses, TC Curtis determined it was not in Biederman's best interest to have those individuals testify. This included Biederman's son, Ryan.[9]

As for the victim's injuries, TC Curtis testified that he needed to use "kid gloves" to poke holes in the severity of her injuries without blatantly calling her a liar. He testified that such a gentle approach is necessary to stay in the jury's good graces. Lastly, TC Curtis testified that he did not call experts because he did not think they would be useful in his overall strategy of showing that these events

---

[8] TC Curtis testified that those preferences are based on his 40+ years of experience practicing as a defense attorney.

[9] Although specifics were not discussed at the post-conviction hearings, the parties alluded to Ryan knowing things or having things to say that could have been detrimental to Biederman's defense.

did occur – which he claimed would be obvious to the jury – but that Biederman was not the one who caused them. He explained that calling experts would have gone "against the credibility of what [he was] trying to do in convincing the jury that Biederman didn't do it." TC Curtis emphasized that the key to the entire case was the fact that the bomb was wired to the brake light and the victim's key fob had been tampered with to ensure the brake light would not activate unless the victim was in the car. Therefore, he claimed, an explosive expert would do little to convince a jury that Biederman did not tamper with the key fob.

After multiple days of evidentiary hearings and the submission of post-hearing briefs, the trial court denied Biederman's RCr 11.42 motion in its August 2020 order. The order concluded that TC Curtis advised Biederman of his decision to prohibit juror notes during deliberations and Biederman agreed with the approach; that TC Curtis was not deficient in failing to consult with experts; and that TC Curtis properly interviewed all the witnesses Biederman suggested.

In December 2020,[10] Biederman filed a CR 60.02 motion to vacate his sentence pursuant to subsections (e) and (f). Biederman claimed that he was entitled to immediate relief because (1) he was presented with new hospital information about the severity of the victim's injuries that established he was

---

[10] The record indicates that Biederman filed his first CR 60.02 motion and memo in support in January 2019 and later supplemented it.

guilty of only second-degree assault; (2) the Commonwealth withheld exculpatory evidence; and (3) there were multiple instances during trial in which the Commonwealth and its witnesses committed perjury.

In July 2021, the trial court denied Biederman's CR 60.02 motion finding that Biederman had full access to the medical records he complained were "new"; that those same medical records were used at trial and introduced as an exhibit; and that the Kentucky Supreme Court had already adjudicated the severity of the victim's injuries. As to the remainder of Biederman's claims, the trial court found that all of the evidence was provided in discovery or that Biederman could have easily obtained such information. Lastly, the trial court found that Biederman was aware of all facts and allegations at trial, and he was not entitled to the special, extraordinary relief under CR 60.02.

Biederman appealed the trial court's orders denying his RCr 11.42 and CR 60.02 motions. In denying his RCr 11.42 motion, he argues the trial court (1) abused its discretion when it found TC Curtis was effective; and (2) made material misstatements of fact in the order, which he claims resulted in the finding that TC Curtis was effective. Additionally, he argues the trial court abused its discretion when it denied his CR 60.02 motion.

## STANDARD OF REVIEW

### A.     RCr 11.42 Motion for Ineffective Assistance of Counsel

When faced with an ineffective assistance of counsel claim in an RCr 11.42 appeal, a reviewing court first presumes that counsel's performance was reasonable. *Commonwealth v. Bussell*, 226 S.W.3d 96, 103 (Ky. 2007) (*quoting Haight v. Commonwealth*, 41 S.W.3d 436, 442 (Ky. 2001) *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009)). We must analyze counsel's overall performance and the totality of circumstances therein in order to determine if the challenged conduct can overcome the strong presumption that counsel's performance was reasonable. *Haight*, 41 S.W.3d at 441-42. In addition, the trial court's factual findings and determinations of witness credibility are granted deference by the reviewing court. *Id.* Finally, we apply the de novo standard when reviewing counsel's performance under *Strickland*.[11] *Bussell*, 226 S.W.3d at 100.

*Commonwealth v. McGorman*, 489 S.W.3d 731, 736 (Ky. 2016).

### B.     CR 60.02 Motion

We review the denial of a CR 60.02 motion under an abuse of discretion standard. *White v. Commonwealth*, 32 S.W.3d 83, 86 (Ky. App. 2000); *Brown v. Commonwealth*, 932 S.W.2d 359, 361 (Ky. 1996). The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citing 5 Am.Jur.2d Appellate Review § 695 (1995)). Therefore, we will affirm the lower court's decision unless there is a showing of some "flagrant miscarriage of justice." *Gross v. Commonwealth*, 648 S.W.2d 853, 858 (Ky. 1983).

---

[11] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

*Stoker v. Commonwealth*, 289 S.W.3d 592, 596 (Ky. App. 2009).

## ANALYSIS

### A.    RCr 11.42 Motion for Ineffective Assistance of Counsel

The Kentucky Supreme Court detailed the requisite two-prong analysis for ineffective assistance of counsel in *Commonwealth v. Searight*, 423 S.W.3d 226 (Ky. 2014). It explained that "a party seeking RCr 11.42 relief for ineffective assistance of counsel has the burden of proving (1) 'that counsel's performance was deficient' and (2) 'that the deficient performance prejudiced the defense.'" *Id.* at 230 (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

The first prong – deficiency – is established by analyzing whether the alleged act or omissions were outside the prevailing professional norms based on an objective standard of reasonableness. *Strickland*, 466 U.S. at 688-89, 104 S. Ct. at 2065; *see also Harper v. Commonwealth*, 978 S.W.2d 311, 315 (Ky. 1998). Importantly, there is "a strong presumption that counsel acted reasonably and effectively" and "a defendant is not guaranteed errorless counsel or counsel that can be judged ineffective by hindsight. . . ." *Mills v. Commonwealth*, 170 S.W.3d 310, 328 (Ky. 2005), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009).

The second prong – prejudice – is established by analyzing whether a reasonable probability exists that, but for counsel's deficient performance, the

result of the proceeding would have been different. *Strickland*, 466 U.S. at 694-95, 104 S. Ct. at 2068; *see also Moore v. Commonwealth*, 983 S.W.2d 479, 488 (Ky. 1998). The trial court in these cases "must consider the totality of evidence before the jury and assess the overall performance of counsel throughout the case in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance." *Mills*, 170 S.W.3d at 328 (citation omitted).

Here, Biederman argues TC Curtis met those standards when he prohibited jurors from taking their notes into deliberation and failed to investigate and prepare a defense. Therefore, he argues, the trial court abused its discretion when it disagreed with Biederman's assertions and found that "the representation . . . was in no way ineffective and that at all times [TC Curtis] provided reasonable and effective counsel in representing [Biederman]."

### i. Juror Notes

Biederman first argues that TC Curtis was ineffective because he agreed with the Commonwealth that jurors should not take their notes into deliberation.[12] During the evidentiary hearings, TC Curtis explained that decision,

---

[12] In Biederman's direct appeal, the Kentucky Supreme Court held that it was not structural error nor palpable error to prohibit jurors from taking their notes into deliberation because the trial court merely approved an agreement between the attorneys. *Biederman*, 434 S.W.3d at 47. The opinion noted that "[h]ad Biederman argued structural error because counsel waived a right only Biederman could waive, his argument might have merit. However, Biederman does not make that argument before us now." *Id.* at 47 n.2.

stating that he hoped it would deter jurors from remembering all the damning evidence against his client while mitigating chances of a "copious note taker" becoming a "super-juror."

As our Supreme Court noted in Biederman's direct appeal, "Biederman cannot now argue a palpable error occurred in refusing to allow the jurors to use their notes in deliberations" because both parties agreed to disallow the practice. *Biederman*, 434 S.W.3d at 47 (citing *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 37-38 (Ky. 2011); *Mullins v. Commonwealth*, 350 S.W.3d 434 (Ky. 2011)). Importantly, during the evidentiary hearings, TC Curtis testified that he discussed that decision with Biederman, and Biederman agreed to the approach "one hundred percent."

The trial court noted that the parties' agreement on the matter, along with TC Curtis discussing the approach with Biederman and the fact that "[Biederman] offered no testimony" to contradict that he did agree with the approach, supported its finding that the decision was not deficient. Biederman now claims that there was no contrary testimony offered because he was not called as a witness and "he cannot call himself to testify." While true that he cannot call himself, the evidentiary hearing clearly showed that the trial court made a final call for any testimony *immediately* following TC Curtis's testimony on juror notes: "final call: any other testimony to come before the court?" At that point,

-11-

Biederman's appellate counsel leaned over to discuss the question with him, and all parties answered that "they're okay." The trial court clearly attempted to address all necessary testimony during the hearing and wanted to avoid this very issue. Therefore, Biederman was presented the opportunity to speak to those issues and he declined to do so. He cannot now claim he was never given the opportunity.

Additionally, Biederman fails to explain how TC Curtis's decision was deficient and provides no argument or evidence as to how the trial outcome would have been different if the jurors had been permitted to take their notes into deliberation. That, along with our Supreme Court's determination that this approach was not erroneous, supports the trial court's decision that counsel was not ineffective.

### ii. Investigation and Preparation of Defense

Next, Biederman claims that the trial court abused its discretion when it found that TC Curtis properly investigated and prepared a defense. Specifically, Biederman claims TC Curtis failed to call witnesses he recommended and failed to consult and call experts to testify. The trial court focused on those issues presented at the evidentiary hearings and in the post-hearing briefs – the alleged failure to call witnesses and failure to consult experts – and we will do the same. It is well established that "RCr 11.42 motions are not intended to conduct further discovery

-12-

or fishing expeditions." *Prescott v. Commonwealth*, 572 S.W.3d 913, 926 (Ky. App. 2019). Vague allegations warrant summary dismissal of the RCr 11.42 motion. *Id.* Accordingly, the trial court was not required to address the other vague and conclusory allegations Biederman presented.

The trial court begins its order with a general acknowledgment that "[t]he evidence against [Biederman] in this case was overwhelming." The trial court further acknowledged that such overwhelming evidence "coupled with the foolish actions of [Biederman] in giving multiple statements to law enforcement and the press created a swirling vortex of perceived guilt [Biederman] could not avoid." Also, the trial court noted that TC Curtis generally acted reasonably and was effective defense counsel. For example, the trial court detailed that TC Curtis strongly advised Biederman to accept the plea deal once it became apparent that the Commonwealth had substantial evidence against him; and even after Biederman decided to go to trial, TC Curtis effectively suppressed testimony that Biederman frequently used explosives in his neighborhood.

As to witnesses, the Kentucky Supreme Court has recognized that "[d]ecisions relating to witness selection are normally left to counsel's judgment and this judgment will not be second-guessed by hindsight." *Foley v. Commonwealth*, 17 S.W.3d 878, 885 (Ky. 2000), *overruled on other grounds by Stopher v. Conliffe*, 170 S.W.3d 307 (Ky. 2005) (citation omitted). Additionally,

-13-

the Kentucky Supreme Court has held that where an attorney chooses witnesses who further the trial strategy, instead of harm it, the attorney was not deficient or unreasonable "when compared to prevailing professional standards under similar circumstances." *Brown v. Commonwealth*, 253 S.W.3d 490, 503 (Ky. 2008).

Here, Biederman alleges that ". . . (4) trial counsel failed to interview witnesses from the parking garage where the bomb went off, (5) trial counsel failed to interview witnesses who were around [ ] Biederman in the days leading up to the explosion, (6) trial counsel failed to consult an independent expert witness regarding the absence of fingerprints on the rest of the car . . . ." Biederman provides no detail as to what those witnesses would have testified to or how such testimony could have assisted in his defense.

As the trial court noted in its order, TC Curtis followed the prevailing professional norms when he decided not to call witnesses who might provide testimony detrimental to Biederman's defense. The trial court noted that the witnesses TC Curtis spoke with mentioned that Biederman was "narcissistic," "controlling," and that "he had been setting off bombs in the past." The trial court noted that such testimony was omitted because of its detrimental nature on Biederman's character and past behaviors. To further TC Curtis's trial strategy that Biederman "didn't do it[,]" he could not call witnesses who could harm that strategy by recalling that Biederman set off bombs in the past. Based on the

-14-

testimony, the trial court found that TC Curtis "provided [Biederman] with effective assistance of counsel in preparation for and during trial[.]"

According to our caselaw, such determinations are not an abuse of discretion. *Id.* Even if the failure to call certain witnesses had been deficient, Biederman provided no discussion as to how their testimony would have resulted in a different outcome. On the contrary, based on the testimony of TC Curtis, calling many of those witnesses could have made the Commonwealth's case even stronger.

Next, Biederman argues TC Curtis was ineffective when he failed to consult and call experts to testify; specifically, medical, computer, and explosive experts. Our Supreme Court has clarified that "it is not necessary 'in all cases [for] an attorney [to] hire a rebuttal expert witness in order to avoid being deemed ineffective.'" *Commonwealth v. York*, 215 S.W.3d 44, 48 (Ky. 2007) (quoting *Thompson v. Commonwealth*, 177 S.W.3d 782, 786 (Ky 2005)). In *York*, our Supreme Court affirmed the trial court's order denying defendant's RCr 11.42 motion claiming ineffective assistance of counsel for failing to call experts. *Id.* It found that the experts were not critical given that other experts testified in favor of the defense theory of the case. *Id.*

Here, the defense theory of the case was that these events occurred but that Biederman "didn't do it." For that strategy, TC Curtis determined that he did

not have to prove that the device under the car seat was a bomb (using an explosives expert), that the victim sustained injuries (using a medical expert), or that the computer was shared by all members of the family (using a computer expert). Instead, as the trial court noted, TC Curtis used "the sound trial strategy of keeping the focus off the severity of the blast and avoid[ed] questioning the victim[']s character all the while inserting doubt in to the juror's minds as to whether [Biederman] committed the crime." That approach, TC Curtis explained, did not require him to call experts on those issues. Instead, it required him to diminish those issues to the best of his ability on cross-examination.

As for a medical expert, Biederman argues a medical expert could have placed doubt on whether the victim sustained a "serious physical injury." The trial court stated that its findings "were based on the medical records and the testimony of the victim and would not have changed by any other proffered testimony. As noted above the trial strategy of [Biederman] was not to attack or question the victim." Importantly, "serious physical injury" is not an element of Biederman's convicted offenses – use of a weapon of mass destruction in the second degree and attempted murder – it is simply a sentencing regime that affects time to be served before parole opportunities. Even if a medical expert had

testified that the victim sustained no injuries, Biederman could have been convicted of the same offenses.[13]

The trial court also emphasized that our Supreme Court discussed the finding of "serious physical injury" in Biederman's direct appeal and determined that there was sufficient evidence for the trial judge to make such determination. Our Supreme Court has made it clear that a palpable error analysis in a direct appeal – as was the case here – is not dispositive of an ineffective assistance claim. *Martin v. Commonwealth*, 207 S.W.3d 1, 4-5 (Ky. 2006). We, however, mention our Supreme Court's finding in the direct appeal simply to state that it found that there was sufficient evidence for the trial court to determine there was "serious physical injury." Specifically, it stated "that it is proper for a trial judge to make that determination where sufficient evidence exists." *Biederman*, 434 S.W.3d at 45 (citation omitted). Our Supreme Court determined in Biederman's case it was proper for the trial judge to make such determination; therefore, sufficient evidence existed on that matter. *Id.*

Agreeing with our Supreme Court that there was sufficient evidence, the trial court added that "[i]t took no expert to read the medical records[,]" especially because the victim testified alongside them. Again, the trial court

---

[13] Use of a weapon of mass destruction in the second degree simply requires *placing* such device in the Commonwealth, and attempted murder requires the intention to commit the offense.

concluded that this trial strategy was not ineffective and "followed prudent trial strategy in attempting . . . to illicit a positive physical presentation of the victim [by calling attention to her ability to walk into court unassisted], while avoiding calling further attention to her injury."

As for a computer expert, the trial court found that TC Curtis "established through both his and the Commonwealth's witnesses that other persons had access to the computer which contained the bomb making searches. No action of an expert could explain away the search history and [TC Curtis] succeeded in inserting the requisite question of doubt" without needing to call additional experts. Further, the trial court noted that TC Curtis was "extremely effective in poking holes in the prosecution's evidence by eliciting [testimony] that others had access to the home computer found to have bomb making recipes[.]" Additionally, the trial court noted that further attention to that matter "could have well backfired."

Lastly, as for an explosives expert, the trial court found that TC Curtis "stayed within sound trial strategy of seeking an acquittal rather than trying to convince the jury a bomb did not detonate." The trial court further noted that attempting to downplay the severity of the crime "would have undoubtedly led to a loss of credibility with a jury." Again, TC Curtis acted within the confines of

prevailing professional norms when he decided to focus on Biederman not planting the bomb instead of trying to discount that the bomb existed.

### iii.    Alleged Misstatements

Lastly, Biederman argues that the trial court made numerous "material misstatements" in its order that found TC Curtis was effective. Biederman alleges that those misstatements resulted in palpable error. We do not agree. For an error to be palpable, it must be "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). "A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis 'boils down to' is whether the reviewing court believes there is a 'substantial possibility' that the result in the case would have been different without the error." *Id.* (citations omitted).

This Court has found misstatements to reach the level of palpable error where the law is misstated and improper, *e.g.*, where an attorney misrepresents that a defendant given the maximum sentence would only serve three years without explaining the three-year possibility relies on parole *eligibility* and is not guaranteed. *Evans v. Commonwealth*, 544 S.W.3d 166, 170 (Ky. App. 2018). There, this Court found that the jury relied on those improper statements,

-19-

thereby resulting in "prejudice to the defendant." *Id.*[14] Alternatively, here, none of

the "misstatements" are the misstatement of law nor did they result in prejudice.

At most, each alleged "misstatement" is a slight variation on the facts of the case;

none of which resulted in prejudice toward Biederman.

> Here, Biederman provides a litany of "misstatements":
>
> (1) the [trial court] stated that only [ ] Biederman and the victim had access to the battery key fob which had been disabled, (2) the [trial court] stated that the brake had to be pressed in order to start the vehicle, (3) the [trial court] stated that the only thing saving the life of the victim was that the pressure of the blast was dissipated when the convertible top was blown off in the blast, (4) the [trial court] stated that [ ] Biederman purposely provoked a telemarketer/scammer in an attempt to deflect future guilt and create a scape goat, (5) the [trial court] stated that bomb making recipes were found on [ ] Biederman's computer, and (6) the [trial court] stated that any question of whether the victim suffered serious physical injury was a question for the [trial court] not the jury and that this decision rested on whether or not the bomb was planted by [ ] Biederman or not.

(Footnotes omitted.)

In the interest of brevity, we will not discuss claims that our Supreme

Court previously addressed in Biederman's direct appeal[15] or claims having no

---

[14] Importantly, *Evans* involved attorneys' misstatements *to the jury* during trial, which resulted in the prejudice. Here, Biederman claims that the trial court's recitation of facts in a post-conviction order were misstatements rising to the level of palpable error.

[15] Our Supreme Court previously adjudicated number six, as discussed previously.

-20-

bearing on the ineffective assistance issues presented, *i.e.*, failure to call witnesses and failure to call experts.

First, Biederman claims the trial court misstated that Biederman and the victim were the only individuals with access to the key fob. That conclusion, however, is the result of an incomplete reading of the opinion. Instead, the trial court stated that "[*t*]*estimony demonstrated* that . . . only [Biederman] and the victim had access to [the key fob,]" which is true. Although the evidentiary hearings discussed that the son likely had access to the key fob (as the trial court noted later in its order), and TC Curtis attempted to assert that possibility at trial, that fact was not testified to at trial.

Second, Biederman disputes whether the victim needed to press the brake to start the vehicle. Although the trial court did state that the brake needed to be pressed to start the car, the goal of such statement was to show that the brake needed to be activated to set off the bomb and the key fob had been disabled to ensure the victim was in the car when the brake was activated. Regardless of whether the brake needed to be pushed to start the vehicle or simply would be pushed while driving, the key fob was disabled to ensure the victim was in the car when it happened. Any misstatement concerning when the brake would be activated was largely irrelevant to the point the trial court was making.

Third, Biederman argues the trial court inaccurately stated that the explosion blew the convertible roof off the car.  He does not expound on what he believes the state of the roof was during the explosion, but the victim did testify that "the top was totally off, [and] the doors were bowed out" after the explosion.  Regardless of whether the top was down prior to starting the car or if the top blew off in the explosion, the point of the trial court's statement was to emphasize that without a convertible roof, the blast would not have dissipated as it did.  Whether the dissipation of that explosion was the result of the roof being flimsy enough to blow off or from it being manually taken off, the important conclusion is that the roof of the victim's car was convertible and capable of such removal.

Lastly, Biederman argues that unlike the trial court's statement that bomb making recipes were found on Biederman's computer, the forensic report showed "only that searches were made.  There was absolutely no evidence that any videos were ever viewed, nor was there any evidence that bomb making recipes were even looked at let alone saved to the computer."  Again, it appears Biederman is attempting to split irrelevant hairs.  The trial court stated that bomb making recipes were on the computer, which the forensic report supported.  Whether those recipes were on the computer for one second or one year, watched or deleted, does not change that fact and certainly does not make the trial court's recitation of that fact a palpable error.

As explained, this Court has found palpable error in misstatements that included misstatements of the law that resulted in prejudice. *Id.* Further, palpable error is reserved for "shocking or jurisprudentially intolerable" errors. *Martin*, 207 S.W.3d at 4. We do not find these alleged misstatements to reach the level of egregiousness required for such a conclusion. Additionally, we see no indication that any of these "misstatements," even if true, were prejudicial to Biederman.

**B.    CR 60.02 Motion**

Biederman's CR 60.02 motion brings claims under subsections (e) and (f). In pertinent part, CR 60.02 states that

> [o]n motion a court may, upon such terms as are just, relieve a party or his legal representative from its final judgment, order, or proceeding upon the following grounds:  . . . (e) the judgment is void, or has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (f) any other reason of an extraordinary nature justifying relief.

CR 60.02 motions are limited and afford special and extraordinary relief not available in other proceedings. *McQueen v. Commonwealth*, 948 S.W.2d 415, 416 (Ky. 1997). "The burden of proof in a CR 60.02 proceeding falls squarely on the movant to 'affirmatively allege facts which, if true, justify vacating the judgment and further allege special circumstances that justify CR 60.02

relief.'" *Foley v. Commonwealth*, 425 S.W.3d 880, 885 (Ky. 2014) (quoting *McQueen*, 948 S.W.2d at 416).

Biederman argues that new evidence existed that could have shown the victim's injuries could result only in a charge of second-degree assault; that the Commonwealth withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and that multiple witnesses committed perjury. Importantly, none of those claims make any showing that the underlying judgment was void (or similar),[16] as required by CR 60.02(e). *Soileau*, 382 S.W.3d at 890. Instead, it appears Biederman is hanging his claims on the argument that each is of an "extraordinary nature justifying relief" under CR 60.02(f).

First, Biederman claims "he was presented new hospital information that could have shown this [Court] that [he] was only guilty of second degree assault." Again, Biederman calls into question the medical records that state the victim sustained second- and third-degree burns. As discussed at length at the evidentiary hearings and in the post-hearing briefs, some of the victim's medical

---

[16] For example, this Court has recognized claims under 60.02(e) when a defendant argued *jurisdictional* shortcomings of the trial court rendered the underlying judgment void. *Foremost Ins. Co. v. Whitaker*, 892 S.W.2d 607, 610 (Ky. App. 1995) ("because service upon [the defendant] . . . was insufficient, the default judgment entered by the trial court was void under CR 60.02(e) for want of personal jurisdiction."); *Soileau v. Bowman*, 382 S.W.3d 888, 890 (Ky. App. 2012) ("the trial court abused its discretion by denying his CR 60.02(e) motion to set aside the judgments and orders in the underlying proceeding for lack of personal jurisdiction.").

records did list second-degree burns; however, there was also a medical record that listed third-degree burns. Additionally, as discussed during the evidentiary hearings, the victim was present at trial and testified to her injuries. None of this information is new. Biederman goes so far as to admit he had these documents during trial, claiming only that he did not see them until the trial began. In fact, as the trial court emphasized, "these 'newly discovered records' were introduced page per page at the trial as Exhibit Number 364." These circumstances do not constitute "newly discovered evidence."

Biederman further claims that he was convicted "based on the victim in the case receiving 'third-degree burns.'" However, as Biederman acknowledges, criminal attempt – the statute under which he was convicted – does not have an injury requirement. Whether the victim sustained a life-threatening injury or walked away unscathed has no bearing on meeting the elements of criminal attempt. Instead, the Commonwealth was tasked to prove that he was guilty of acting with the culpability otherwise required for commission of the crime and that he intentionally engaged "in conduct which would constitute the crime if the attendant circumstances were as he believe[d] them to be." KRS[17] 506.010(1)(a). The Commonwealth succeeded in that endeavor. Use of

---

[17] Kentucky Revised Statute.

evidence provided at trial to allegedly disprove a non-element of the offense does not meet the standards of CR 60.02.[18] The trial court did not abuse its discretion when it made such determination.

Next Biederman claims that there were "multiple instances in which the prosecution withheld exculpatory evidence[,]" violating *Brady* requirements.[19] *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. 1196-97. But this rule only applies to "those cases in which the government possesses information that the defense does not[,]" and only applies to the discovery of information after trial. *Bowling v. Commonwealth*, 80 S.W.3d 405, 410 (Ky. 2002).

Biederman first claims that the Commonwealth withheld an interview with Keith Blankenship; however, Biederman notes in his brief that Keith called him *immediately* after the interview concluded and explained the contents of the interview. Such interview, Biederman claims, could have "shown that the ATF

---

[18] *See also Foley*, 425 S.W.3d at 886: "Furthermore, and perhaps most importantly for our present purposes, 'in order for newly discovered evidence to support a motion for new trial it must be 'of such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted.'''"

[19] A couple of these claims include interviews or phone calls with Biederman himself and do not fall under the purview of "suppressed evidence" under *Brady*. As such, we need not address them.

was looking for an accomplice and show that he could not have had time to effect the device on that day." But as the trial court noted, Biederman knew of this interview before trial and could have easily requested additional information regarding it, as he was clearly aware that the interview took place. His decision not to do so does not constitute a *Brady* violation on the part of the Commonwealth.

Second, Biederman claims that the Commonwealth withheld interviews of Kristy McCormick and his son, in which both were wearing a wire to get information on the other. Biederman claims that had he had access to such recordings, he could have shown Kristy's involvement or knowledge in the incident and "may have" heard exculpatory evidence to the defense. These claims are immaterial. Biederman is not claiming that there was exculpatory evidence withheld; he is speculating that interviews *may have* contained exculpatory evidence. He supplies no proof that there actually was exculpatory evidence in those interviews. This is unlike *Brady*, in which the "exculpatory evidence suppressed by the prosecution [ ] was a statement made by the defendant's accomplice in which he admitted that it was he who had committed the actual killing." *McQueen*, 948 S.W.2d at 418. There, the government knew of specific statements that had been made and the government suppressed them.

-27-

Alternatively, Biederman puts forth nothing but hopeful speculation. We will not vacate a conviction on such grounds.

Next, Biederman claims interviews with his son and daughter "would have shown that there was no way that [he] would have done this against his spouse. . . ." However, it is unclear how this information was suppressed, as his daughter testified at trial to that exact sentiment. As discussed above, it was a strategic decision to keep the son from testifying because he had information that could have been detrimental to the defense. The trial court did not abuse its discretion when it determined these claims were meritless.

Lastly, Biederman claims that Lisa Regan's interview should have been released; however, as Biederman acknowledges, Lisa testified at trial. He claims – again, based *entirely* on hopeful speculation – that such interview *would have* contained discussions of marital problems between Biederman and the victim, had there been any. These "suppressions," again, are not the subject of *Brady*. And as the trial court noted, much like the medical records presented at trial, all evidence Biederman alleges was "withheld" was in fact "provided to [him] through discovery or could have easily been obtained by [him] upon request or leave of Court available prior to trial."

As to the perjury claim, this Court has explained that "an action based on perjured testimony may not be brought more than one year after the original

judgment under Rule 60.02 . . . ." *Copley v. Whitaker*, 609 S.W.2d 940, 942 (Ky. App. 1980). As such, Biederman's perjury claims are time-barred. The trial court entered final judgment in Biederman's case in 2012 and Biederman filed his CR 60.02 motion in 2020. Biederman provides no reasoning as to why he did not bring these allegations of perjury in a timely manner. As such, Biederman's claims of perjury under CR 60.02 are time-barred.

Importantly, as the trial court noted, even if these claims were timely, Biederman failed to present any valid – much less extraordinary – reason for relief under CR 60.02. Kentucky caselaw requires that in "[i]n such cases, 'the burden remains on the defendant to show both that a reasonable certainty exists as to the falsity of the testimony and that the conviction probably would not have resulted had the truth been known before [the Defendant] can be entitled to [CR 60.02] relief.'" *Meece v. Commonwealth*, 529 S.W.3d 281, 286 (Ky. 2017) (citation omitted). Our Supreme Court has explained that "a person commits perjury 'when he makes a material false statement, which he does not believe, in any official proceeding under an oath required or authorized by law.'" *Id.* (quoting KRS 523.020).

Here, Biederman simply questions the truth of some witness statements, based on his own recollection. However, alleged contradictions to witness testimony do not prove perjury. *Id.* Even where a witness made a false

statement that was material to the credibility of their testimony, the Kentucky Supreme Court could not, with reasonable certainty, say the witness believed those statements to be false. *Id.* at 287. As such, the Kentucky Supreme Court upheld the trial court's denial of the defendant's CR 60.02 motion claiming that witness committed perjury. *Id.* Having even less proof that any of Biederman's listed witnesses actually made false statements – much less believed them – neither can we.

The trial court did not abuse its discretion when it found Biederman's CR 60.02 motion to be meritless.

**CONCLUSION**

We find the trial court did not abuse its discretion when it denied Biederman's RCr 11.42 motion and found TC Curtis was effective counsel. Nor do we find that the alleged misstatements of the trial court constituted palpable error. Lastly, we find the trial court did not abuse its discretion when it denied Biederman's CR 60.02 motion. The orders of the Boyd Circuit Court are AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Thomas Biederman, *pro se*
La Grange, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Frankfort, Kentucky